UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-against-

KRIS SERGENTAKIS,

                Defendant.

15 Cr. 33 (NSR)

MEMORANDUM & ORDER

---

NELSON S. ROMÁN, United States District Judge

    Currently pending is the Government's unopposed request to have Defendant Kris Sergentakis involuntarily medicated with antipsychotic drugs in the hope that, after a period of treatment, he will regain competency to stand trial or to enter into a plea agreement related to his indictment for witness retaliation, in violation of 18 U.S.C. § 1513(e), and cyberstalking, in violation of 18 U.S.C. § 2261A(2).

## BACKGROUND

    On October 20, 2015, this Court held a competency hearing with all parties present where Defendant, defense counsel, and the Government agreed to proceed based on medical reports submitted to the Court by the parties. On that record, Defendant was found incompetent to stand trial and, the next day, he was committed to the care of a treatment facility pursuant to 18 U.S.C. § 4241(d)(1). (*See* Oct. 20, 2015 Mem. & Order (finding of incompetence), ECF No. 40; Oct. 21, 2015 Order (commitment for medical evaluation), ECF No. 41.) Defendant has been under the care and supervision of the Federal Medical Center, Devens ("FMC Devens") since December 10, 2015.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/26/2016

On June 13, 2016, FMC Devens and the assigned psychologist, Dr. Shawn E. Channell, issued a report ("Devens Report") opining that there is a substantial probability that Defendant's competency "can be restored with a period of treatment with antipsychotic medication" and requesting that the Court authorize involuntary administration of such medication. (Devens Report at 13, 16.) FMC Devens also concluded that Defendant does *not* pose a danger to himself or others, (*id.* at 13-14), which is consistent with all other prior evaluations of Defendant's demeanor and diagnosis of a delusional disorder.[1] This Court requested additional information from FMC Devens regarding the treatment plan, including details concerning the proposed course of medication, the appropriateness of using the medication to treat delusional disorders, and the impact of any potential side effects on Defendant's ability to meaningfully participate in his defense. (*See* June 20, 2016 Order.) FMC Devens provided that information in its July 7, 2016 Forensic Report Addendum (Dr. Channell and Dr. Howard Haas) ("Supp. Report"). The Government then sought, and defense counsel did not oppose, involuntary medication of Defendant pursuant to the treatment plan. (*See* July 22, 2016 Application by the Government ("Gov. Applic."); July 31, 2016 Letter from Defense Counsel to the Court.)[2]

On August 12, 2016, this Court determined that, as the Government's application was unopposed, an independent expert was required to advise the Court on the merits of the proposed

---

[1] The Court previously reviewed the three psychological and/or psychiatric evaluation reports issued in this matter – the defense reports of Dr. Alan M. Goldstein, dated September 8, 2015, and Dr. Andrew P. Levin, dated September 25, 2015; and the Bureau of Prisons report of Dr. Dana Brauman, dated October 2, 2015. All three of the reports conclude that Defendant is suffering from a mental disease or defect, namely Delusional Disorder of a mixed or unspecified type. At defense counsel's request, Dr. Thomas A. Caffrey, who previously treated Defendant, provided an email, dated October 18, 2015, confirming that he did not disagree with the reports' conclusions.

[2] The Government's request in this regard is not uncommon. *See* Susan A. McMahon, *It Doesn't Pass the Sell Test: Focusing on "The Facts of the Individual Case" in Involuntary Medication Inquiries*, 50 AM. CRIM. L. REV. 387, 392 (Spring 2013) (defendants suffering from delusional disorder "account for at least twenty-one percent of defendants in reported *Sell* cases, perhaps because these individuals are associated with litigious behavior," such as "fil[ing] multiple lawsuits or send[ing] hundreds of letters of protest to government and judicial officials").

treatment plan.  (Mem. & Order, ECF No. 56.)  The rationale for such an appointment was that it would serve the dual aims of protecting Defendant's liberty interests and testing the details of the proposed treatment plan to ensure that the Court could reliably decide whether or not to order the forcible medication—without the need to substitute Defendant's voice with that of a guardian.  (*Id.*)  On September 16, 2016, the Court appointed an independent expert in clinical and forensic psychiatry, Dr. Merrill Rotter, pursuant to Federal Rule of Evidence 706.  (Order, ECF No. 63.)  Dr. Rotter submitted his opinion, essentially concurring with FMC Devens on the merits of the proposed treatment plan, on October 10, 2016 ("Rotter Report").

## DISCUSSION

In *Sell v. United States*, the Supreme Court provided four factors, or requirements that a Court must find to be true, which guide a determination on the forcible medication of a criminal defendant in situations where the defendant does not pose a danger to himself or others,[3] *i.e.* solely for competency purposes.  539 U.S. 166, 180-83 (2003).  Where defense counsel and the Government are in agreement,[4] but Defendant vehemently disagrees,[5] on the necessity of embarking on a course of action that significantly impairs Defendant's liberty interests, the Court does not take lightly its responsibility to protect his due process rights.  Mr. Sergentakis

---

[3] As there is no contention that Defendant is dangerous, the medication proposal is outside of the guidelines enumerated in *Washington v. Harper*, 494 U.S. 210 (1990), and the procedural safeguards set forth in 28 C.F.R. § 549.46 (forcible medication on dangerousness grounds).  *See United States v. Mann*, 532 F. App'x 481, 488 (5th Cir. 2013) ("an administrative hearing and its attendant procedures are no longer required where a court orders involuntary medication solely to render an inmate competent to proceed to trial").

[4] Defense counsel, noting that defense expert Dr. Levin generally agrees with the proposal and finds it "medically sound," consented to the treatment plan after considering his ethical obligations to his client and determining that it was in Defendant's best interests to have a "chance for a life free of the delusions that have haunted him for years[.]"  (Letter from Defense Counsel to the Court (July 31, 2016).)

[5] Defendant has "consistently refused to take antipsychotic medication" for his illness.  (Devens Report at 15; *id.* at 6 (Defendant "refused to take psychotropic medication during his evaluation at MCC New York" and while at FMC Devens "perseverated on the fact [that] he had previously been diagnosed with delusional disorder"), 13 ("because he does not believe he has a mental illness requiring treatment, he has refused to accept medication").)

undoubtedly "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs," *Harper*, 494 U.S. at 221, even if the proposed treatment plan is designed to restore his competency to stand trial by treating his mental illness. *Sell*, 539 U.S. at 179.

This Court must "make a careful finding as to whether there is a substantial probability of defendant attaining competency with additional custodial hospitalization." *United States v. Magassouba*, 544 F.3d 387, 407 (2d Cir. 2008). "[I]n light of the importance of judicial balancing, and the implication of deep-rooted constitutional rights, a court that is asked to approve involuntary medication must be provided with a complete and reliable medically-informed record, based in part on independent medical evaluations, before it can reach a constitutionally balanced *Sell* determination." *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1137 (9th Cir. 2005); *see also United States v. Weston*, 134 F. Supp. 2d 115, 119 (2001) (independent expert appointed to assist court). After seeking the input of an independent medical professional, the Court is prepared to determine whether the allegedly important governmental interests in prosecuting Defendant for the crimes charged in the indictment, considered in conjunction with the treatment plan as proposed by FMC Devens and Dr. Channell at the request of the Government, expounded upon by Dr. Channell and Dr. Haas at the request of the Court, subsequently evaluated by defense expert Dr. Andrew P. Levin,[6] and independently evaluated by the Court's expert Dr. Rotter, warrant forcibly medicating Defendant in order to restore his competency to stand trial. *Sell*, 539 U.S. at 183.

Under *Sell*, the Court must find by clear and convincing evidence that: (1) "*important* governmental interests are at stake;" (2) "involuntary medication will *significantly further* those

---

[6] Both parties have stipulated that the reports from FMC Devens contain the substance of what the experts would offer in opinion testimony if the Court held a hearing. (Aug. 5, 2016 Stip. at 1, ECF No. 55.) Defense counsel further stipulated that defense expert Dr. Levin would offer his opinion that the treatment plan is "medically sound and has a substantial probability of restoring the defendant to competency." (*Id.* at 2.)

concomitant state interests," such that "administration of the drugs is substantially likely to render the defendant competent to stand trial" and "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense;" (3) "involuntary medication is *necessary* to further those interests;" and (4) "administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical condition." *Id.* at 180-81; *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004) (*Sell* "findings must be supported by clear and convincing evidence"). Based on the evidence submitted,[7] the Court will decide whether "the Government, in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of [the] antipsychotic drug treatment, [has] shown a need for that treatment sufficiently important to overcome the [Defendant's] protected interest in refusing it[.]" *Sell*, 539 U.S. at 183.

The Court turns to the merits of the treatment plan before balancing the intrusive nature of involuntary medication against the Government's alleged interest in prosecuting Defendant.

## I.     The Treatment Plan

As outlined in the Supplemental Report, the proposed treatment plan consists of injecting Defendant with "long acting antipsychotic medication" in the event that he continues to "refuse[] to accept the recommended treatment of oral antipsychotic medication after receiving a copy of [a] Court Order" requiring he submit to treatment. (Supp. Report at ¶¶ 2-3.) FMC Devens will first administer a 5 mg "test dose" of haloperidol and, so long as it is "well tolerated," Defendant

---

[7] Given the stipulation and agreement between the parties, and the additional testing of the proposal by the Court-appointed expert, the Court can conduct this determination without a separate formal evidentiary hearing. *See Magassouba*, 544 F.3d at 399 (parties in agreement and no additional hearing held); *United States v. Campbell*, No. 13 Cr. 419 (DLI), 2015 WL 9460133, at *2-3 (E.D.N.Y. Dec. 23, 2015) (parties in agreement and order granted based on uncontroverted findings). The Court is well aware of Defendant's perspective regarding his competence. (*See, e.g.*, Defendant's *Pro Se* Motion to Vacate the Competency Determination, at 3 (Mar. 9, 2016) (Defendant stated that "the word incompetent has never been used to describe" him and argued that any attempt to "accuse" him of being incompetent was "ridiculous" and "based on [a] fraud" carried out by his attorney).)

would receive an injection of haloperidol decanoate.  (*Id.* at ¶ 3.)  This dosage would be repeated after two weeks, with adjustments to the dosing schedule "as clinically indicated."  (*Id.*)  Haloperidol is considered a first-generation antipsychotic, as opposed to more modern second-generation drugs such as risperidone, aripiprazole, or ziprasidone.  (*Id.* at 5, 9 ¶ 1.)

### a. The Probability of Medication Rendering Defendant Competent Without Trial-Related Side Effects

The Supplemental Report indicates, citing to various clinical studies reviewing the results of involuntary medication on "incompetent defendants suffering from psychotic disorders" including "defendants with Delusional Disorder," that the likelihood that Defendant can be restored to competency after Court mandated treatment with antipsychotic medication is somewhere between 75% to 81%.  (*Id.* at 4.)  The mid-range Herbel study, finding 77% of patients with delusional disorder could be restored to competency,[8] also noted improvement in all but one patient treated with haloperidol decanoate.  *See, e.g.*, Bryon L. Herbel & Hans Stelmach, *Involuntary Medication Treatment for Competency Restoration of 22 Defendants with Delusional Disorder*, 35 J. AM. ACAD. PSYCHIATRY L. 1, 47-59 (Mar. 2007) ("Of the 181 defendants who were involuntarily medicated for competency restoration during this period, 22 had delusional disorder[;] [s]eventeen (77%) of th[ose] defendants . . . improved sufficiently for the forensic evaluators to opine that they had been restored to competency after involuntary treatment with antipsychotic medication."); Christopher F. Fear, *Recent developments in the*

---

[8] A more recent clinical review suggests similar treatment efficacy using second-generation antipsychotics, with approximately half of patients treated achieving a full recovery, which is likely more than necessary to achieve competency to stand trial.  *See* Marie R. Mews & Arnim Quante, *Comparative Efficacy and Acceptability of Existing Pharmacotherapies for Delusional Disorder: A Retrospective Case Series and Review of the Literature*, 33 J. CLINICAL PSYCHOPHARMACOLOGY 449, 518 (Aug. 2013) ("Manschreck and Khan found improvement rates of up to 89.6% in their review, of which 49.3% of patients recovered fully.  However, other articles report figures as low as 60%, of which only 18.2% experienced a full remission of symptoms.  The improvement rate in our case series was 67% (comprising 50% full recovery and 17% improvement).").

*management of delusional disorders*, 19 ADVANCES IN PSYCHIATRIC TREATMENT 161, 216 (May 2013) (noting "12 [of the 22] offenders [in the Herbel study] received monthly injections of haloperidol decanoate (25–150 mg), with all but 1 person (on 150 mg four-weekly) improving").

The Supplemental Report also notes, however, that the American Psychiatric Association ("APA") practice guidelines indicate that "10% to 30% of patients will have little or no response to antipsychotic medications and up to an additional 30% of patients have [only a] partial response . . . ." (Supp. Report at 4.) Thus, while the clinical research cited by the Report indicates, in the worst case, that 25% of patients may not be rendered competent via the proposed treatment, the APA guidelines present the less optimistic potential that 60% of patients may not be successfully restored to competency. Nevertheless, FMC Devens opines that the treatment is substantially likely to render Defendant competent to stand trial, ostensibly because "there is no reason to believe his treatment response would differ" from the clinical studies and therefore no reason to assume his success rate would resemble the "worst treatment outcomes." (*Id.* at 4.)

With regard to side effects that could impact Defendant's ability to aide in his defense, the Supplemental Report opines that "the proposed treatment with antipsychotic medications is unlikely to adversely affect [Defendant's] cognition and is, in fact, more likely to enhance it." (Supp. Report at 5.) Sedation, the only side effect that is applicable to this analysis, "is usually temporary and can be managed with dosage adjustment." (*Id.* at 4.) The other potential side effects, discussed *infra*, are more relevant to whether treatment is medically appropriate.

Dr. Rotter concurs with FMC Devens' opinion regarding the likelihood of rendering Defendant competent, explaining that the "delusions associated with the disorder and the targets for the recommended treatment are the primary drivers of [Defendant's] lack of competency." (Rotter Report at 5.) "Therefore, successful treatment of the [disorder] should be successful in

rendering him competent to stand trial as well." (*Id.*)  Noting the availability of additional medications to manage any potential side effects, Dr. Rotter also agrees that the proposed treatment is "substantially unlikely to lead to [trial competency related] side effects." (*Id.*)

Therefore, the Court concludes that the weight of the evidence presented points to the treatment plan having a sufficient probability of success, in that it is both substantially likely to render Defendant competent and substantially unlikely to lead to side effects that will interfere with his ability to aide in his defense.  *Sell*, 539 U.S. at 181; *see, e.g.*, *Gomes*, 387 F.3d at 161-62 (defendant with delusional disorder was substantially likely to be rendered competent given "70 percent success rate . . . through treatment (voluntary or not) with anti-psychotic medication"); *United States v. Decoteau*, 857 F. Supp. 2d 295, 298 (E.D.N.Y. 2012) ("chance of restoration of about 70%" for a male defendant suffering from a delusional disorder).

### b. *The Necessity of Forced Medication as Compared to Less Intrusive Methods*

The only less intrusive method of treatment available is "psychotherapy, specifically cognitive-behavioral therapy," which the Supplemental Report indicates would have a low likelihood of success since Defendant "has no insight into his mental illness." (Supp. Report at 8; Rotter Report at 5 (concurring with opinion that success of "talk therapy" is "unlikely")); *see also United States v. Gomes*, 305 F. Supp. 2d 158, 168 (D. Conn.), *aff'd*, 387 F.3d 157 (2d Cir. 2004) ("[Doctor] indicated that alternative treatment (less intrusive treatments such as therapy or individual group therapy) would not be effective in restoring [Defendant] to competence because of [his] lack of insight into his illness.").  FMC Devens does suggest, however, that the mental health professionals would first attempt initiation of voluntary medication-based treatment by "present[ing] [Defendant] with a copy of the Court Order authorizing involuntary treatment" before implementing the forced treatment plan. (Supp. Report at 9 ¶ 1.)

Given the low likelihood of success with the only alternative to medication available, the Court concludes that all of the evidence suggests the treatment plan is necessary. *Sell*, 539 U.S. at 181 ("less intrusive treatments are unlikely to achieve substantially the same results"). However, the Court prefers that Defendant be given the chance to voluntarily engage in treatment, in part due to the ability for the treatment providers to utilize a broader range of medication when treatment is voluntary. Thus, the Court requires that the first step in any treatment plan be an attempt to "enlist the Defendant's cooperation by engaging in a discussion of the available options of taking oral antipsychotic medications on a daily basis at the lowest effective dose." (Supp. Report at 9.) As suggested by FMC Devens, trials should begin with the atypical drugs "given their somewhat more favorable overall side effect profile." (*Id.*)

> c. *The Appropriateness of Medication Given Defendant's Mental Disorder and State of Health*

The Supplemental Report opines that the use of antipsychotic medication "is considered an essential element" in treating psychotic disorders" and its efficacy "has been repeatedly demonstrated in published professional literature for nearly 50 years[.]" (Supp. Report at 8.) The Second Circuit has opined that the use of antipsychotics is appropriate to treat the same disorder. *United States v. Gomes*, 305 F. Supp. 2d 158, 165 (D. Conn.), *aff'd*, 387 F.3d 157 (2d Cir. 2004) ("attempt[ing] to treat [defendant] with 'atypical' [second-generation] anti-psychotics"); *see also* Haleigh Reisman, *Competency of the Mentally Ill and Intellectually Disabled in the Courts*, 11 J. HEALTH & BIOMEDICAL L. 199, 224 n.141 (2015) ("Competency restoration literature shows that eighty to ninety percent of defendants with a mental illness are restored to competence, generally within six months. Medication plays a large role in restoring competence to individuals who are mentally ill.").

FMC Devens also indicates that side effects, which may impact Defendant's health, can be easily monitored and medication switched as necessary. For example, the Supplemental Report describes "[n]euromuscular side effects [] associated with all antipsychotic medications, but [that] are more likely to occur with a first generation antipsychotic, such as haloperidol[.]" (Supp. Report at 5); *Gomes*, 305 F. Supp. 2d at 166 ("atypicals produce less side effects than may occur with the older, typical anti-psychotics"). Some of these are "frightening and painful to the patient," but are "easily, effectively, and quickly treated with anticholinergic medication." (Supp. Report at 5.) Others require reducing the dose of the antipsychotic medication, or "adding a beta-blocker" to the dosing regimen. (*Id.*) FMC Devens plans to monitor Defendant for the development of any of these side effects and offer him appropriate medication to manage the symptoms as needed. (*Id.* at 6.) Devens also plans to prevent other long-term side effects "by prescribing [the] antipsychotic medications at the lowest effective dose." (*Id.*)

There are also potential metabolic side effects, which are more prevalent in second-generation antipsychotics, though possible under any antipsychotic treatment plan. (*Id.* at 6.) Defendant will be regularly monitored for "weight gain, possible worsening of diabetes or possible emergence or worsening of serum lipids." (*Id.*) As Dr. Rotter further explained, "[w]hile some of the possible medication choices may exacerbate [Defendant's] existing predisposition to Diabetes, this is a side effect that can be easily monitored, and if it develops, is reversible with medication changes." (Rotter Report at 6.)

Nevertheless, there are some "rare dangerous" potentially fatal side effects associated with antipsychotic medication such as "neuroleptic malignant syndrome," which is "where the body loses its ability to regulate its temperature," occurring in 0.07% to 2% of treated patients. (Supp. Report at 7); *United States v. Hardy*, 724 F.3d 280, 287 (2d Cir. 2013). Another rare side

10

effect is cardiac arrhythmias, the rate of which is approximately doubled as a result of using antipsychotic medication. (Supp. Report at 7 (instances usually occur at a rate of 7 per 10,000 individuals versus 10-15 events per 10,000 individuals using antipsychotic medication).) The Supplemental Report indicates these dangerous side effects "are quite rare, as reflected by the extremely low base rates of medication associated death from neuroleptic malignant syndrome or cardiac arrhythmias." (*Id.*) Dr. Rotter also suggests that "alternative anti-psychotic medication can be tried which may not have the same side effects." (Rotter Report at 5.)

Therefore, the Court concludes that the treatment plan is appropriate for Defendant's condition in this case. *Sell*, 539 U.S. at 181. Which antipsychotic drugs are employed is best determined by the treating doctors consistent with this opinion, so long as voluntary use of the atypical drugs is attempted prior to forced medication with typical antipsychotics. *See Gomes*, 305 F. Supp. 2d at 168 n.4 (court "decline[d] to order a particular course of anti-psychotic drug treatment, as that is best determined by the treating doctors").

The sole remaining question is whether the Government has demonstrated a sufficiently important interest for this Court to impose the proposed plan on Defendant.

## II.     The Government's Interest in Prosecuting Defendant

The Supreme Court and the Second Circuit require this Court to find, by clear and convincing evidence, both that "*important* governmental interests are at stake" and that "involuntary medication will *significantly further*" the Government's interest in bringing Defendant to trial for the crimes charged, "consider[ing] the facts of the individual case[.]" *Sell*, 539 U.S. at 180-81; *Gomes*, 387 F.3d at 160. Some question if society needs to punish or prosecute the mentally-ill for crimes that may be merely extensions of their illness. Susan A. McMahon, *It Doesn't Pass the Sell Test: Focusing on "The Facts of the Individual Case" in*

11

*Involuntary Medication Inquiries*, 50 AM. CRIM. L. REV. 387, 412-14 (Spring 2013) ("consideration of the facts of the individual case—including the nature of the individual's crime—would help courts identify those cases where the government interest is not just 'important,' but important enough to justify medication," since "[s]everal courts have . . . refused to medicate defendants when the crimes seem to be a manifestation of their mental illness"). Others suggest that the very concepts of personal liberty and autonomy require fairly administered involuntary medication procedures as part of the basic social contract to which every citizen agrees:

> In effect, all members of civil society agree to fair, impartial procedures that permit conscientious administration of competence-restoring treatment as a way to allow society to treat us as ends in ourselves (that is, as a human beings who may answer for wrongdoing through punishment) and not merely as a means (as irrational creatures to be confined because of dangerousness).

Douglas Mossman, M.D., *Is Prosecution "Medically Appropriate"?*, 31 NEW ENG. J. ON CRIM. & CIV. CONFINEMENT 15, 77 (Winter 2005).

"The Government's interest in bringing to trial an individual accused of a serious crime is important." *Sell*, 539 U.S. at 180. For the retaliation charge, which carries the greatest potential sentence in this case, Defendant could be sentenced to a term of imprisonment of up to ten years. (Gov. Applic. at 6); 18 U.S.C. § 1513(e). *See also Magassouba*, 544 F.3d at 393 (conspiracy to distribute heroin, subjecting the defendant to a "sentencing range from ten-years-to-life incarceration," was a serious crime); *Gomes*, 387 F.3d at 160 (possession of firearm by convicted felon, subjecting the defendant to a "possible statutory minimum of fifteen years' imprisonment," was a serious crime). "Courts, however, must consider the facts of the individual case in evaluating the Government's interest in prosecution." *Sell*, 539 U.S. at 180. The nature of the allegations, including the impact of the crime and whether it affects society at

12

large or focuses on a particular individual, inform the importance of bringing a defendant to trial. Here, the type of retaliation alleged demonstrates the seriousness of the crime.

### a. The Seriousness of the Alleged Crimes

The alleged victim in this case is Defendant's former employer, who provided information to the Government leading to Defendant's conviction in 2006 for a commercial bribery scheme. *United States v. Sergentakis*, No. 15 Cr. 33 (NSR), 2015 WL 3763988, at *1 (S.D.N.Y. June 15, 2015); *see also United States v. Sergentakis*, 307 F. App'x 520, 521 (2d Cir. 2009) ("Sergentakis pleaded guilty to a commercial bribery conspiracy in which he awarded printing contracts to certain vendors in exchange for kickbacks."). In 2007, while incarcerated, Defendant allegedly mailed numerous defamatory letters to the victim and executives at the victim's place of employment. *Sergentakis*, 2015 WL 3763988, at *1. The letters stated that the victim had been arrested for molesting his six-year-old daughter,[9] and informed the victim that Defendant would distribute flyers to the community communicating that fact for "[a]s long as [he] live[d]." *Id.* at *1 (some of these mailings also indicated that Defendant's original term of imprisonment for fraud occurred because the victim had "bought" a federal judge).

Following Defendant's release from prison in 2010 and continuing through at least his recent arrest, Defendant allegedly created and maintained a series of websites containing similar statements to those previously sent to the victim and his colleagues. *Id.* at *1-2. In addition to allegedly repeating his accusations that the victim was arrested for child molestation, the websites allegedly included various other statements, such as Defendant was "railroaded into federal prison for 55 months . . . for speaking out about" the victim, the victim "enjoy[ed]

---

[9] Subsequent law enforcement investigation has concluded the victim in this case has never been arrested for child molestation or for any other state or federal offense.

13

beating helpless animals . . . [and] would beat [his] dog to a pulp," the victim "c[ould] rape your wife, molest your children and burn down your house," and graphics including pictures of the victim and his family obtained from social media, and an image of a guillotine with the title "THE CURE FOR PEDOPHILLIA" followed by the message that "We all have a responsibility to keep children safe from pedophiles" like the victim. *Id.* at *2.

Defendant also allegedly created a Facebook page containing much of the same information described above, posted similar statements on other websites, and emailed much of the same content to individuals, donors of the victim's non-profit organization, and the media. *Id.* Defendant also sent emails to, among others, the then-principal of the victim's children's school, stating "this is something u need to know about" and including a link to his website. *Id.* As a result, Defendant was charged in a two-count indictment on January 20, 2015, for witness retaliation, in violation of 18 U.S.C. § 1513(e), and cyberstalking, in violation of § 2261A(2).

        *b.   The Importance of Prosecuting Defendant*

Notably, the crimes alleged against Defendant may be, and are in fact likely to be, a manifestation of his mental illness. The overlap between Defendant's illness and the crimes diminish the traditional governmental interests of rehabilitation and deterrence, making the most significant interest the avoidance of further harm to the victim. Defendant's situation, therefore, varies significantly from controlling examples in this Circuit, in that those cases involved crimes that were arguably unrelated to the defendant's mental illness, or which carried a risk of violence. *Magassouba*, 544 F.3d at 391 (conspiracy to distribute heroin); *Gomes*, 387 F.3d at 160-61 (possession of firearm by convicted felon, an "armed career criminal"). But Defendant's situation also contrasts with example where courts have found the Government's interest

insufficiently important to warrant involuntary medication due to the inability of the defendant to carry out the crimes charged or the period of time already served by the defendant.[10]

Defendant has allegedly carried out a course of intimidation and cyberstalking over a period of seven years, which if shown to be true means he has subjected the victim to significant harassment. (Gov. Applic. at 6.)[11] *Cf. United States v. Lindauer*, 448 F. Supp. 2d 558, 571-72 (S.D.N.Y. 2006) (defendant's "unsuccessful attempt to influence an unnamed government official" matched "the record show[ing] that even lay people recognize[d] that she [was] seriously disturbed," and led the court to conclude it would be impossible for her to act as "an agent of the Iraqi government" given her delusional disorder, which made "[t]he government's interest . . . in prosecuting [her] significantly weaker than it was in either *Sell* or *Gomes*"). Although Defendant has been in custody since December 2014, awaiting trial for almost two years, if he is convicted for these crimes, then he may be subjected to additional imprisonment.

The Sentencing Guidelines suggest a range of imprisonment of 37 to 46 months' imprisonment for someone with Defendant's criminal history in relation to the crimes charged. (*Id.* at 6 n.4.) A sentence at the bottom of the guidelines range could result in at least another year of imprisonment. *Cf. United States v. Weinberg*, 743 F. Supp. 2d 234, 237 (W.D.N.Y. 2010) (defendant's long period of pretrial detainment for his threat against a judicial officer, which was "consistent with [his] illness, schizophrenia with paranoid delusions," and unlikely to

---

[10] As discussed above, there is sufficient evidence of the merits of the proposed course of medication to find it sufficiently likely to be successful, necessary, and appropriate in this case. *Cf. United States v. White*, 620 F.3d 401, 410-22 (4th Cir. 2010) ("special circumstances," including the amount of time the defendant had already spent in jail, the non-violent and unexceptional nature of her crimes, her inability to own firearms, and the lack of data regarding antipsychotics used on women "so undermine[d] the government's interests" in prosecuting her that the *Sell* order was reversed).

[11] In the victim's related civil action, he alleged having to "repeatedly explain that he is not a pedophile" and that he has had "difficulty finding new employment after leaving" the non-profit where he was CEO, in large part due to "the 'noise' and nuisance generated by Defendant's websites and Defendant's false and defamatory statements." (Notice of Removal, Ex. B at ¶¶67-70, No. 15 Civ. 5681 (CS), ECF No. 1.)

be acted upon given that he informed government officials and the FBI of his "ideation," led the court to determine that the Government's interest in continuing the prosecution of the defendant was "very low"); *United States v. Zarei*, No. 13 Cr. 1570-001 (PHX), 2015 WL 3648955, at *4 (D. Ariz. June 11, 2015) (deciding under the necessity prong of *Sell* that "the Government's interests in incapacitation, deterrence, or rehabilitation" were insufficient, because "[e]ven successful treatment w[ould] not serve the 'important governmental interests . . . at stake' when [the defendant] ha[d] already served the sentence he would [have] receive[d] if convicted").

More importantly, in the Government's view, a sentence could be accompanied by a protective order and other terms of supervised release designed to insulate the victim from further harm. (*Id.* at 6-7.) This is particularly relevant because if prosecution is not possible, then Defendant may not be subject to civil confinement, where he could receive treatment for his mental illness, due to the fortunate lack of violent behavior on his part up to this point. (*Id.* at 7); 18 U.S.C. § 4246 (applicable where "release would create a substantial risk of bodily injury to another person or serious damage to property of another") and § 4248 (only applicable to a "sexually dangerous person"). Thus, the Government urges that a conviction, by trial or plea, is necessary "to vindicate and protect the interests of the victim" and the Government. (Gov. Applic. at 6.) To allow this type of retaliation to go unpunished would undermine key aspects of our criminal justice system by discouraging victims and witnesses from coming forward.

The case against the dentist-defendant in *Sell*, who received a second indictment for threatening a witness and the FBI agent investigating the fraud charges against him, most closely resembles the instant case against Defendant. *See Sell*, 539 U.S. at 170. But Sell was never involuntarily medicated, because he regained competency in time to avoid such an order and to

plead no contest to the pending charges.[12]  Even if Defendant expressed a similar desire, that course is unavailable to him.  He cannot currently plead guilty, or no contest, to the crimes charged because there has been no indication by the staff at FMC Devens that Defendant has regained any competency—nor do his recent writings to the Court indicate such a likelihood.  (*See, e.g.*, Defendant's "Request for Removal" (Sept. 16, 2016) (arguing that the undersigned has "allowed the enforcement of outlaw nonconstitutional 'law'" against him), ECF No. 64.)

The Court, therefore, must decide whether Defendant should be forcibly medicated to further the Government's interests in prosecuting him.  Considering the nature of the crimes with which Defendant is charged, the allegations that he has already committed those crimes *for years* with no plans to stop, and the need to protect the victim from further harassment, the Court finds "involuntary administration of drugs is necessary" in order "to further a particular governmental interest, namely, the interest in rendering the defendant *competent to stand trial*."  *Sell*, 539 U.S. at 181.  In this case, the potential that Defendant's conduct is a manifestation of his mental illness weighs in favor of ordering medication to treat the illness, hopefully restoring Defendant's competency, and allowing for an adjudication that will protect the Government's interest in protecting the victim from further harassment.

---

[12] In Sell's case, after the matter was remanded by the Supreme Court for further proceedings, the Government unsuccessfully re-applied to have Sell forcibly medicated.  Five years of dubious treatment, *see* Carolyn Tuft, *Judge rules no Sell trial next week*, ST. LOUIS POST-DISPATCH, Nov. 23, 2004, 2004 WLNR 12168326 (alleging mistreatment by the medical staff at FMC Springfield), and evaluation had passed since Sell was originally found incompetent to stand trial.  Unexpectedly, the medical treatment center certified him as competent, and the trial court determined he had regained enough competency to understand and participate in the proceedings.  *United States v. Sell*, Nos. 97 Cr. 290 & 98 Cr. 177 (DJS), ECF No. 545, Order at 5-8 (July 12, 2004) (finding Sell currently "capable of precluding the interference" of "his potentially delusional beliefs" but noting "mental status is not necessarily on a fixed course and may fluctuate over time").  The Government's involuntary medication motion was, in light of Sell's renewed competency, denied.  *Id.*  Sell was, therefore, able to plead no contest to the crimes charged and to be sentenced to a period of supervised release, including mandatory participation in a mental health treatment program.  *Sell*, Nos. 97 Cr. 290 & 98 Cr. 177 (DJS), ECF No. 658, Judgment at 1, 3 (Apr. 15, 2005).

## CONCLUSION

It is hereby ordered that, consistent with this Opinion and Order, the Government's application for the involuntary medication of Defendant is GRANTED. FMC Devens is authorized to treat Defendant for up to four months pursuant to 18 U.S.C. § 4241(d)(2). Any physical or laboratory assessments, and any monitoring procedures, which are clinically indicated are similarly authorized. FMC Devens is to commence treatment as soon as practicable and to provide the Court with periodic updates in order for timely determinations to be made as to the need to continue, alter, or cease the treatment plan. During this first treatment cycle, FMC Devens must provide the Court with a status update after three months of treatment. Additionally, Defendant's motion to dismiss the indictment is DENIED without prejudice—motions must be filed by Defendant's counsel. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 65.

Dated: October 26, 2016
White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge